989 A.2d 795

**Walter Carl ABBOTT**

v.

**STATE of Maryland.**

**No. 1900, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Feb. 25, 2010.

596

598

600

Arthur M. Frank, Baltimore, for appellant.

Jessica V. Carter (Douglas F. Gansler, Atty. Gen. on the brief), Baltimore, for appellee.

Panel: HOLLANDER, GRAEFF and JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

HOLLANDER, Judge.

Following a trial in October 2008, a jury in the Circuit Court for Baltimore County convicted Walter Carl Abbott, Jr., appellant, of threatening to injure Governor Martin O'Malley, a State official, in violation of MD. CODE (2002, 2008 Supp.), § 3–

708(b) of the Criminal Law Article ("C.L.").[1] The alleged threat was contained in an e-mail message that appellant sent to a State website in March 2008. The court sentenced appellant to a suspended term of six months' incarceration and imposed a fine of $500.[2]

This appeal followed. Appellant poses four questions, which we have rephrased slightly and reordered:

1. Did the circuit court err in failing to grant appellant's motion for judgment of acquittal, based on the insufficiency of the evidence?

2. Did the trial court err in failing to propound appellant's requested jury instructions 9 through 13, all of which state relevant federal and state constitutional provisions relating to one's freedom of speech and to petition the government for a redress of grievances?

3. Did the cumulative effect of the trial judge's jury instructions create reversible error, i.e., primarily instructing the jury that Governor O'Malley need not be present for the State to prove the case, no intent was required, nor was it necessary for the State to show that the e-mail in question was a real threat, and, for refusing to instruct the jurors that they are to narrowly construe the statute and that a threat must be distinguished from constitutionally protected speech?

4. Did the trial court err in granting the State's motion in limine, preventing defense counsel from arguing to the jury at opening and closing that the alleged threat was protected by the free speech clause of First Amendment to the United States Constitution and Article 40 of the Maryland Declaration of Rights?

---

1. Appellant was also charged with a violation of C.L. § 3–708(c) (sending and delivering a threat to a State official). At trial, however, the State did not pursue that charge.

2. The court also placed appellant on two years of unsupervised probation on the condition that he remain at least 500 feet from Governor O'Malley and his wife.

For the reasons set forth below, we shall vacate the conviction and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

Prior to jury selection, the State moved for a protective order with respect to records that appellant subpoenaed from the Maryland State Police regarding the executive protection detail assigned to Governor O'Malley.[1] Appellant's counsel explained that he sought the information to establish that injuring the Governor "[i]s an impossibility with the way the Governor is protected." The court granted the protective order.

In addition, the State moved "to prevent the Defendant from arguing to the jury that the speech that constitutes the threat in this case, or the alleged threat, is protected by the First Amendment." The court also granted that motion.

Appellant subpoenaed Governor O'Malley "or his designee" for the trial. A notice attached to the subpoena stated: "In the event you do not wish to appear for trial personally as a witness, the attached Subpoena authorizes you to designate another person to appear on your behalf with information, calendars, and notes which would show your basic itinerary for the dates noted." The Governor did not appear at appellant's trial.

At trial, the State called one witness, Maryland State Police Sergeant Adam Stachurski, who was assigned to the Homeland Security Intelligence Division. Stachurski testified that, shortly after 7:30 a.m. on March 18, 2008, appellant sent an e-mail from his home computer to a State website maintained by

---

**3.** Before trial, appellant was evaluated by the Department of Mental Health and Hygiene, Office of Forensic Services. He was found competent to stand trial.

**4.** The State initially characterized the motion as a "motion in limine." The State said, in part: "It's our contention that the Defendant's ability at any given time to carry out this threat is irrelevant and ... we'd ask for a protective order with that regard."

the Office of the Governor. The website solicited feedback in the following format:

**Contact Governor O'Malley**

**We'd like to hear from you.**

Whether you're a citizen of Maryland or just visiting our great state, your comments and suggestions are welcome. Please use the form provided below to tell us what you think. Your feedback is valuable—it gives the Governor and his staff useful information that helps improve our service to all Marylanders.

Be sure to include your E-mail address so a response may be provided. You should receive an electronic acknowledgement [sic] shortly after sharing your comments.

\* \* \*

Thanks for taking the time to contact the Governor's Office of Maryland. Come again!

-Martin O'Malley, *Governor*

The website included fields for personal information about the individual composing the message. Select fields required that all characters be capitalized. The content of the message was limited to 4000 characters. As explained on the website, longer communications were to be sent to the Governor's Office via postal mail.

The commentator's name was requested in four categories (prefix, first, last, and suffix). Appellant typed his name as "FUCK Walter Carl Abbott YOU." He provided his actual address and phone number in the appropriate fields. Under the category for "Organization Name," appellant typed "FUCKING SOLD OUT AMERICAN," and he identified his relationship to this organization as "president." He did not fill out the request for "my correspondence topic" or "subject." The text of his electronic message was as follows:

O'Malley, getting ready to lose my wife after 24 years of marri[a]ge. 3rd construction co. & 2nd house I am going to lose because of no good fucking government like you and

pieces of shit like you. If i[sic] ever get close enough to yoy [sic], I will rap [sic] my hands around your throat and strangle the life from you. This will solve many problems for true AMERICAN'S [sic]. Maybe you can send your MEXICAN army after me, you no good AMERICAN SELL OUT PIECE OF SHIT. I HOPE YOU DROP DEAD BEFORE I GET TO YOU, I WOULD HATE TO TO [sic] LOSE MY LIFE BECAUSE OF A PIECE OF SHIT LIKE YOU. FUCK YOU TRULY

WALTER C. ABBOTT JR.

The parties stipulated that the Governor's office received the e-mail. Upon receipt, the Governor's Office forwarded the e-mail to the Maryland State Police. Stachurski immediately began to investigate appellant.

Stachurski arrived at appellant's residence at approximately 11:50 a.m. on March 18, 2008, the same day that appellant sent the e-mail. According to Stachurski, appellant "welcomed us and brought us into his house." He continued:

> We sat down at his table, explained if he knew why (inaudible), he put is head down and said yes and at that time I handed him a copy of the e-mail as I read it to him to see if he was familiar with the e-mail.... He was visibly shaken and said yes, he sent it out.

Stachurski added: "[H]e said as soon as he hit the button he knew he wanted to take it back at that point."

On cross-examination, Stachurski indicated that he did not know whether Governor O'Malley actually read or received the e-mail. He agreed that appellant was "cooperative," and never tried to hide that he sent the e-mail. Moreover, he indicated that Abbott told him that he sent the e-mail because "sending this message would receive a response"; Abbott "regretted sending the e-mail"; and he indicated that "he meant no harm." According to Stachurski, appellant did not show "anger but he showed some discern [sic] towards illegal immigration issues."

Appellant moved for judgment of acquittal at the close of the State's case. He argued:

[W]hen someone threatens a Judge ... there's no, absolutely no political purpose in making that threat. But when you send a threat to a website invited by the Governor's people himself, that invites public comment and you couple that alleged threat with some political statements on immigration, I don't like what you're doing and if I could ever, if I could ever get close enough to you, which is a condition, I would choke the life from you. The First Amendment ... The Maryland Declaration of Rights, Article 40, all talks about a person's right to freedom of speech. . . . [W]hen the threat is made in the context of a political statement, every place cited by *Pendergast, Watts, Ma[i]sonet, Barcl[e]y,* every case that did not sustain the conviction [had similar] factors ... One, the victims, when they sustained the conviction, the victim, alleged victim, was there to testify they got the letter, they got the threat and felt threatened and number two, there was absolutely no political purpose made with the alleged threat. . . .

Appellant's counsel added:

[T]here's no requirement that Governor O'Malley testify but there's another thing missing from the State. It was sent to a Governor's website. . . . There's no testimony that Governor O'Malley even received the threat. That certainly should be a condition of a conviction ...

In appellant's supporting memorandum, he argued that his e-mail was "nothing more than 'political hyperbole' " about illegal immigration. Abbott's attorney pointed to the trooper's testimony that appellant said he was just trying to gain the Governor's attention. Appellant also noted that "there has been absolutely no testimony in evidence Governor O'Malley even knows this e-mail was sent," nor did the State prove that appellant "was even aware that his response to a government web site, inviting comments in the first place, would ever be read by the Governor." Further, the defense argued:

It is abundantly clear ... that if the letter was ambiguous, meaning one person could think the letter a threat and another interpretation could be that Mr. Abbott was making

a political statement, the Court should grant Defendant's motion for judgment of acquittal. Moreover, any reasonable person, even considering the evidence in a light most favorable to the State, would conclude that Mr. Abbott's e-mail was nothing more than "political hyperbole," protected by one's inherent right to free and unfettered political expression. Since there is no real ambiguity and it is clear Mr. Abbott was, in-fact, making a political statement ... this Court should grant his motion for judgment of acquittal.

The court denied appellant's motion. Appellant then testified in his own defense. After discussing his family, employment history, and the construction company that he founded, appellant addressed the e-mail in issue.

Appellant stated that Stachurski and four other officers arrived at his house on the morning that he posted his e-mail. He recalled:

The first thing they told me when they come in, they showed me the picture of me, showed me my criminal record, you have no criminal record so, you know, and they started talking to me and asked me about it.... [T]hey had said, well, you're not being arrested. We, we don't take this as a [v]iable threat ... I said, I, I never meant it to be as a threat.

Appellant also testified about an earlier e-mail that he received from Delegate Patrick L. McDonough on February 12, 2008, concerning House Bill 885 and House Bill 1232.[5] According to Delegate McDonough's e-mail, which was introduced into evidence, House Bill 885 "prohibits Maryland towns and cities from passing 'sanctuary' laws," while House Bill 1232 "will allow citizens to file a complaint against an elected or public official based on the premise that the official is violating the Federal Immigration Act. The complaint could eventually result in removal from office." Further, the e-mail

---

5. House Bill 885 was titled "Counties & Municipal Corporations— Illegal Alien 'Sanctuary Laws'—Prohibition." House Bill 1232 was titled "Citizens' Rights Act."

explained that this Bill "provides an opportunity for everyone to visit Annapolis and express their concerns about the entire illegal immigration problem."[6]

In regard to Delegate McDonough's e-mail, appellant stated:

> It's about a citizen's alert important date for Tuesday, March 11th, 2008 at 1:00 pm for a dear fellow citizens, go to Annapolis to help support House Bill 885, House Bill 1232 and several bills that Delegate [Ronald A.] George and Delegate McDono[u]gh were trying to have passed.

Appellant explained that he subsequently testified before the House Judiciary Committee in Annapolis, on March 11, 2008. In describing the "general nature" of his testimony, appellant said:

> [W]e're getting overrun by everybody losing their jobs and, in construction and everything. It's, I mean, it's out there in plain sight and it's getting harder and harder to pay bills with, and them not passing these bills that would have made it harder on illegals to come here and just take our jobs from us.

Abbott denied that he tried to seek out the Governor when he was in Annapolis on March 11, 2008. Claiming it was "the first time [he'd] ever been to Annapolis," appellant denied knowledge of the Governor's places of work and residence. The following testimony is relevant:

> [APPELLANT'S COUNSEL]: Well, at that time, how did you feel about Governor O'Malley?
>
> * * *
>
> [APPELLANT]: I thought that he was, he's in charge of this State that maybe he could step up and be a hero to the

---

6. The e-mail also provided the following examples in which a complaint might be filed: "public official support for illegal alien drivers' licenses, discounted college tuition, construction of day labor centers, access to public benefits, and other budgetary and policy actions."

people and put a stop to all the illegals coming here and taking our jobs.

In addition, appellant described a sign posted on the front fence of his house, protesting the presence of illegal immigrants. A photograph of the sign, admitted into evidence, said: "DEPort ILLEGAL'S, IM●Prison BUSH!, BY Order oF THE AMERICAN PEOPLE!!!" Noting that he never intended to imprison President Bush, appellant explained: "I don't have any powers."

With respect to the e-mail in issue, appellant was asked when he "first decide[d] to e-mail the Governor?" He responded:

When I went up on that blog, on the Governor's blog, I was looking for his telephone number.... And when I called they were still closed, it was around 7:30. It said, I believe it said they opened up at 8:00. So I didn't have any work that day so I was just sitting there and I read that blog and it asked me how I feel and I put down how I felt because I felt maybe that would get his attention and maybe I would get to talk to him about the issues at hand.

The following ensued:

[APPELLANT'S COUNSEL]: ... [D]id you intend to threaten the Governor?

[APPELLANT]: No.

\* \* \*

[APPELLANT'S COUNSEL]: Did you think you could go down to Annapolis and put your hands around him and choke him?

[THE PROSECUTOR]: Objection.

[APPELLANT]: No way.... How could you even get close enough to him, if you want to touch the Governor you would, you know, his staff would be all over you. It was just a statement, trying to get an answer from him. Just like the sign on the fence said, it didn't say anything about O'Malley. It had nothing to do with him. I was hoping to talk to a

Governor of the State that I live in to hopefully ... hear my story and maybe he could do something about it instead of not doing anything about it and hurting the people of Maryland.

Appellant indicated that he signed his name, put his address on the e-mail, as well as his telephone number, "and at the end it said call me." [7] The following colloquy is pertinent:

[APPELLANT'S COUNSEL]: ... Did you believe that the Governor would actually read his web postings?

[APPELLANT]: Well, I was hoping he would. When I called back to his office, when they finally opened up and talked to his secretary, I tried to see if I could get to talk to him and he just told me, you're just one person. You know, we get three hundred calls a day. He said, he's not going to talk to you. I said, well, I've spoken to thousands of Marylanders and gotten their opinions and so shouldn't that count as more than one person?

[APPELLANT'S COUNSEL]: Let me ask you, hypothetically, if they were going to give you an appointment with the Governor, what were you planning on doing?

\* \* \*

[APPELLANT]: I would like to talk to him about the situation and how this is hurting so many businesses in the State of Maryland. I mean, it's, in 2005 its [sic] facts that three hundred and thirty-eight billion dollars [are] wasted on illegals in this country and that's not counting jobs

---

7. At trial, appellant denied that he used certain "cuss words" in the e-mail. He claimed that the e-mail had been altered, because it contained words he did not type and would never say. For example, he claimed: "I didn't type fuck Walter Carl Abbott you. Didn't type that." But, he admitted that he called the Governor "a no good piece of shit American sellout." He added: "I wrote most of this stuff but like I said there was things added in.... These are not the exact words, these are not my exact words."

For the purpose of this appeal, these assertions are not pertinent. Appellant stipulated at trial that he sent the e-mail. His lawyer said: "Well, we're agreeing that basically that was the overall content of the e-mail ... that's not the issue anyway."

they're taken from the Maryland people from whatever State they're from.

[APPELLANT'S COUNSEL]: ... [I]f the Governor disagreed with you or didn't see it your way, were you going to get up from your chair and strangle the man?

[APPELLANT]: No, then I would have had to decide whether I was just moving out of the State of Maryland or just move out of this country.

[APPELLANT'S COUNSEL]: So did you ever intend to seek out the Governor and strangle him?

[APPELLANT]: No.

[APPELLANT'S COUNSEL]: Or choke him?

[APPELLANT]: No.

[APPELLANT'S COUNSEL]: Have you ever choked anyone else?

[APPELLANT]: No.

On cross-examination, appellant was asked if he knew why the State Trooper came to his house. He answered, "Sure," acknowledging that "it was because [he] sent an e-mail ..." The following transpired:

[THE PROSECUTOR]: And you told them that you shouldn't have done it, didn't you?

[APPELLANT]: No, I told them I regret sending it but you never get an answer in any way from anybody on the situations at hand.

[THE PROSECUTOR]: You regretted sending it because you knew it was wrong to threaten the Governor, didn't you?

[APPELLANT]: No.

[THE PROSECUTOR]: You didn't? That's not why you regretted it?

[APPELLANT]: No, I did not regret it because of saying I'm threatening the Governor. It's, I was wishing he would take it for what it was when I put my phone number and everything on there, address, and maybe the man would have called me.

[THE PROSECUTOR]: So you didn't regret sending this, this e-mail to the Governor?

[APPELLANT]: Oh, yes, I do. I do regret sending it now.

[THE PROSECUTOR]: Right, because . . .

[APPELLANT]: Because of all the trouble it[']s caused.

[THE PROSECUTOR]: Right, because it's against the law, right?

[APPELLANT]: I thought it was only against the law to threaten the President of the United States.

[THE PROSECUTOR]: Well, if it's against the law to threaten the Governor, you knew this was a threat against the Governor, didn't you?

\* \* \*

[APPELLANT]: I'm just telling you, I'm a construction worker. I have a tenth grade education. I don't keep up on all the laws and everything. I'm not going to law school . . .

The prosecutor also asked appellant if he had lost a house. Appellant claimed he had. With regard to his current home, appellant said: "I'm making it month to month now. . . ." But, he conceded that, when he wrote the e-mail, his "house was not in default." The following ensued:

[THE PROSECUTOR]: Okay. Were you getting ready to lose your wife of twenty-four years at the time you sent this e-mail?

[APPELLANT]: I would hope not but the pressures and everything that was putting on us, it seems that way.

[THE PROSECUTOR]: Okay. You don't have any problems with immigrants, it's illegal immigrants that you object to, is that right?

[APPELLANT]: Correct.

[THE PROSECUTOR]: Because you think that everybody, no matter how noble their purpose, should obey the law, isn't that right?

[APPELLANT]: How noble their purpose? If they weren't here in the first place and our Governor wasn't giving away jobs to them and giving away two and a half million dollars to support them taking the American jobs from them, then nobody would be feeling this way.

[THE PROSECUTOR]: You think everybody should obey the law, right?

[APPELLANT]: Yes, yes, I do.

Appellant's wife, Linda Abbott, and his mother-in-law, Gloria Harris, testified as character witnesses. Both testified to appellant's reputation for honesty and nonviolence.

At the close of evidence, appellant renewed his motion for acquittal, arguing that there was no "evidence where the jury could find beyond a reasonable doubt that he intended this threat." The court stated:

A person may not knowingly and willfully make a threat to take the life of or cause physical injury to a State official. We don't get into intent. We get into did he knowingly and intentionally make the threat and certainly there's a threat to cause physical injury to a State Official.... So the Motion for judgment of acquittal is denied....

Thereafter, the court instructed the jury and counsel presented closing arguments. As noted, the jury convicted appellant of a violation of C.L. § 3–708(b).

Additional facts will be included in our discussion of the issues presented.

## DISCUSSION

### I.

Appellant first argues that the evidence was insufficient to sustain his conviction because, "on its face, the alleged threat was nothing more than a political statement and therefore protected by the First Amendment to the United States Constitution and ... similar provisions in the Maryland Declaration of Rights." Noting that his statements "were **not**

mailed to the Governor's home," appellant points out that his e-mail was sent "in response to an invite at a politically sponsored website." Moreover, he insists that his remarks "were entirely predicated upon his views on the illegal immigration issue" and his e-mail "was *only* made for a political · purpose." Claiming the content was "an obvious statement against the government's position on immigration issues," appellant posits: "It cannot be realistically argued or even suggested that [appellant's] letter was anything but political bantering, or, in the language used by the Supreme Court . . .; the statement is allowing the citizen's inherent right to freedom of speech and expression: 'political hyperbole.'"

Furthermore, appellant complains that the State did not present evidence that Governor O'Malley was "ever aware" of Mr. Abbott's email, or that the Governor "experienced any type of fear upon reading the letter." He also maintains that the content of the communication was "conditional and therefore not a 'real' threat."

The State counters that the evidence was legally sufficient to prove that "Abbott knowingly and willingly made a threat to cause physical injury or death to Governor O'Malley," in violation of C.L. § 3–708(b). Noting that it is undisputed that on March 18, 2008, Abbott composed and sent the e-mail from his home computer to an official website of the State, addressed to Governor O'Malley, the State insists that appellant's "attempt to characterize the e-mail message as political hyperbole falls short." In its view, the message does not "contain politically protected speech," because the e-mail's "references to 'true AMERICAN'S' and 'your MEXICAN army' and 'AMERICAN SELL OUT PIECE OF SHIT' are ambiguous at best," and the e-mail "says nothing about immigration or illegal immigration." Rather, the State claims:

> [T]he e-mail conveyed a message that a reasonable person receiving the message could interpret as a serious expression of an intent to harm. It communicated an intent to inflict harm by choking Governor O'Malley and strangling the life out of him. It communicated a desire that the Governor die. . . . The message was unequivocal in its threat

to harm the Governor. It was not ambiguous or capable of being viewed as anything but a threat to cause physical injury or death to the Governor. Further, the fact that the e-mail message expressed a condition, *i.e.*, "if I ever get close enough to you," does not mean that the message did not convey a "true threat."

Moreover, the State maintains that appellant acted willfully, as required under the statute, because he "intended to send the threatening e-mail to the Governor." According to the State, "[w]hether Abbott actually intended to harm the Governor is irrelevant," because C.L. § 3–708 "requires only that Abbott intended to make a threat against a State official, and his own testimony confirms that he did have that intent."

The standard of review for the sufficiency of evidence is well settled. We must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original); *see Rivers v. State,* 393 Md. 569, 580, 903 A.2d 908 (2006); *Moye v. State,* 369 Md. 2, 12, 796 A.2d 821 (2002). Notably, appellate review of the sufficiency of evidence does not involve "a review of the record that would amount to a retrial of the case." *Winder v. State,* 362 Md. 275, 325, 765 A.2d 97 (2001); *see Brown v. State,* 182 Md.App. 138, 156, 957 A.2d 654 (2008). As a reviewing court, "[w]e do not re-weigh the evidence, but 'we do determine whether the verdict was supported by sufficient evidence, direct or circumstantial, which could convince a rational trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt.'" *State v. Smith,* 374 Md. 527, 534, 823 A.2d 664 (2003) (quoting *White v. State,* 363 Md. 150, 162, 767 A.2d 855 (2001)).

Factual determinations, such as the resolution of conflicting evidence and weighing the credibility of witnesses, are always matters for the fact finder. *Longshore v. State,* 399 Md. 486, 499, 924 A.2d 1129 (2007). As this Court has said:

"In an action tried before a jury, it is the jury's task, not the court's, to measure the weight of evidence and to judge the credibility of witnesses. In performing this role, the jury has the power to decide which testimony to accept and which to reject. In this regard, it may believe part of a particular witness's testimony, but disbelieve other parts of that witness's testimony. Moreover, it is the exclusive function of the jury to draw reasonable inferences from proven facts."

*Smith v. State*, 176 Md.App. 64, 69, 932 A.2d 773 (2007) (quoting *Velez v. State*, 106 Md.App. 194, 201–02, 664 A.2d 387 (1995), *cert. denied*, 341 Md. 173, 669 A.2d 1361 (1996)). Put another way, the jury is "free to discount or disregard totally [a defendant's] account of the incident. . . ." *Binnie v. State*, 321 Md. 572, 581, 583 A.2d 1037 (1991).

▆▆▆▆ In our review, we draw all rational inferences that arise from the evidence in favor of the prevailing party. Nevertheless, this precept does not license an appellate court to indulge in rank speculation. " 'If upon all of the evidence, the defendant's guilt is left to conjecture or surmise, and has no solid factual foundation, there can be no conviction.' " *Brown, supra*, 182 Md.App. at 173, 957 A.2d 654 (quoting *Taylor v. State*, 346 Md. 452, 458, 697 A.2d 462 (1997)); *see Dukes v. State*, 178 Md.App. 38, 47–48, 940 A.2d 211, *cert. denied*, 405 Md. 64, 949 A.2d 652 (2008).

With the applicable standard of review in mind, we turn to consider C.L. § 3–708 (Threat against State or local official). It provides:

(a) *Definitions.*—(1) In this section the following words have the meanings indicated.

(2) "Local official" means an individual serving in a publicly elected office of a local government unit, as defined in § 10–101 of the State Government Article.

(3)(i) "State official" has the meaning stated in § 15–102 of the State Government Article.

(ii) "State official" includes the Governor, Governor-elect, Lieutenant Governor, and Lieutenant Governor-elect.

(4) "Threat" includes:

(i) an oral threat; or

(ii) a threat in any written form, whether or not the writing is signed, or if the writing is signed, whether or not it is signed with a fictitious name or any other mark.

(b) *Prohibited—Making threat.*—A person may not knowingly and willfully make a threat to take the life of, kidnap, or cause physical injury to a State official or local official.

(c) *Same—Sending or delivering threat.*—A person may not knowingly send, deliver, part with, or make for the purpose of sending or delivering a threat prohibited under subsection (b) of this section.

(d) *Penalty.*—A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $2,500 or both.

The text of C.L. § 3–708 is almost identical to that of its predecessor, MD.CODE ANN. (1957, 1992 Repl.Vol., 1993 Supp.), Art. 27 § 561A, which was enacted in 1989. The only substantive alteration to C.L. § 3–708 was to extend the provision to include "local officials." *See* C.L. § 3–708(a)(2) and (b). Article 27, § 561A "was patterned on a substantially similar provision in 18 U.S.C. § 871(a), which prohibits threats to take the life of or inflict bodily harm upon the President of the United States."[8] *Pendergast v. State,* 99 Md.App. 141, 145, 636 A.2d 18 (1994).

---

**8.** The federal statute states, in part:

§ 871. **Threats against President and successors to the Presidency.**
(a) Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined under this title or imprisoned not more than five years, or both.

In *Pendergast*, we noted the absence of Maryland cases construing Article 27, § 561 A, and looked to cases interpreting the federal statute to aid in construing the Maryland statute. Since *Pendergast*, no reported Maryland cases have addressed the elements of a violation of C.L. § 3–708(b) or its predecessor.[9] Therefore, as in *Pendergast*, we shall look to analogous federal cases to assist in our analysis of appellant's sufficiency claim.

We begin with *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam), in which the Supreme Court upheld the constitutionality of the analogous federal statute. It said, *id.* at 707, 89 S.Ct. 1399:

> Certainly the statute under which petitioner was convicted is constitutional on its face. The Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence. See H.R. Rep. No. 652, 64th Cong., 1st Sess. (1916).

Similarly, the parties here agree that C.L. § 3–708 is constitutional. Nevertheless, appellant insists that his e-mail was outside the scope of the statute, as the content was protected by his right to free speech, guaranteed by the First Amendment to the Constitution and Article 40 of the Maryland Declaration of Rights.[10]

---

**9.** In *Gillespie v. State*, 370 Md. 219, 220, 804 A.2d 426 (2002), the Court of Appeals determined that an Assistant State's Attorney is not a State official under Article 27, § 561A. But, it did not otherwise construe the statute.

**10.** The First Amendment to the United States Constitution states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Article 40 of the Maryland Declaration of Rights provides: "That the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege." We construe Article 40 in *pari materia* with the First

The word "threat" has been defined as an expression of "a determination or intent to injure presently or in the future." *Martin v. United States,* 691 F.2d 1235, 1240 (8th Cir.1982), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983); *see also Moosavi v. State,* 355 Md. 651, 664, 736 A.2d 285 (1999) (construing Art. 27, § 9, and defining threat as a " 'communicated intent to inflict' harm") (quoting Black's Law Dictionary at 1480 (6th ed.1990)); *United States v. Dysart,* 705 F.2d 1247, 1256 (10th Cir.) (defining threat in 18 U.S.C. § 871 as " 'an avowed present determination or intent to injure presently or in the future' ") (citation omitted), *cert. denied,* 464 U.S. 934, 104 S.Ct. 339, 78 L.Ed.2d 307 (1983).

As indicated, C.L. § 3–708(b) prohibits a knowing and willful threat. "A threat is knowingly made if the maker comprehends the meaning of the words uttered; it is willfully made if the maker voluntarily and intelligently utters the words in an apparent determination to carry out the threat." *United States v. Howell,* 719 F.2d 1258, 1260 (5th Cir.1983) (discussing 18 U.S.C. § 871(a)), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984). *See United States v. Pinson,* 542 F.3d 822, 832 (10th Cir.2008) (holding that the " 'willfulness' requirement is satisfied when 'those who hear or read the threat reasonably consider that an actual threat has been made' ") (citation omitted), *cert. denied,* —— U.S. ——, 129 S.Ct. 1369, 173 L.Ed.2d 627 (2009).

Notably, in order to convict, the State "must prove a 'true threat,' " *Dysart,* 705 F.2d at 1256, which is distinct from " 'words as mere political argument, talk or jest.' " *Id.* (quoting, with approval, trial court's jury instructions). A "true threat" is not constitutionally protected speech. Ordinarily, it is for the trier of fact to determine whether a statement constitutes a true threat. *See United States v.*

Amendment. *WBAL–TV Div., Hearst Corp. v. State,* 300 Md. 233, 243 n. 4, 477 A.2d 776 (1984); *Peroutka v. Streng,* 116 Md.App. 301, 308, 695 A.2d 1287 (1997); *Pendergast,* 99 Md.App. at 148, 636 A.2d 18; *Pack Shack, Inc. v. Howard County,* 377 Md. 55, 64–65 n. 3, 832 A.2d 170 (2003).

*Roberts,* 915 F.2d 889, 891 (4th Cir.1990), *cert. denied,* 498 U.S. 1122, 111 S.Ct. 1079, 112 L.Ed.2d 1184 (1991); *United States v. Carrier,* 672 F.2d 300, 306 (2d Cir.) (discussing 18 U.S.C. § 871(a)), *cert. denied,* 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982).

Whether a particular communication constitutes a true threat depends on both its language and its context. *Pendergast,* 99 Md.App. at 149, 636 A.2d 18. As the United States Court of Appeals for the Fourth Circuit explained in *Roberts,* 915 F.2d at 890–91, "the context in which the words were written, the specificity of the threat, and the reaction of a reasonable recipient familiar with the context in which the words were written are factors which must be considered" in determining whether a writing is a "true threat." *See also United States v. Miller,* 115 F.3d 361, 363 (6th Cir.) (stating that "if a reasonable person would foresee that an objective rational recipient of the statement would interpret its language to constitute a serious expression of intent to harm, kidnap, or kill the President or other statutorily protected target, that message conveys a 'true threat' "), *cert. denied,* 522 U.S. 883, 118 S.Ct. 213, 139 L.Ed.2d 147 (1997); *United States v. Davis,* 876 F.2d 71, 73 (9th Cir.) (per curiam) (noting that the recipient's state of mind, as well as actions taken in response, are relevant to the determination of whether a true threat was made), *cert. denied,* 493 U.S. 866, 110 S.Ct. 188, 107 L.Ed.2d 143 (1989).

Of import here, "[a] threat may be considered a 'true threat' even if it is premised on a contingency." *United States v. Bellrichard,* 994 F.2d 1318, 1322 (8th Cir.), *cert. denied,* 510 U.S. 928, 114 S.Ct. 337, 126 L.Ed.2d 282 (1993); *see United States v. Kosma,* 951 F.2d 549, 554 n. 8 (3d Cir.1991) (recognizing that conditional threats could still be considered "true threats"); *Dysart,* 705 F.2d at 1256 (" 'A statement may constitute a threat even though it is subject to a possible contingency in the maker's control' ") (quoting trial court's jury instructions with approval). *Cf. Moosavi,* 355 Md. at 664, 736 A.2d 285 (construing former Art. 27, § 9, which

provided that "a person may not threaten ... to: (1) Set fire to or burn a structure," and stating that the statute "does not look to the truth or falsity of the statement; rather, it punishes statements which constitute communicated intentions to do harm"). Nor is the government required to prove the present ability or intent to carry out the threat. *Roberts,* 915 F.2d at 890; *Dysart,* 705 F.2d at 1256; *see United States v. Armel,* 585 F.3d 182, 185 (4th Cir.2009) ("defendant's inability to carry out specific threats does not render them unthreatening or harmless"). Moreover, the statement may be a threat even if it was never communicated to the intended recipient. 2 L. Sand, *et al.,* MODERN FEDERAL JURY INSTRUCTIONS—CRIMINAL, § 31–4 (2009) ("MFJI"). Nor must the intended recipient testify at a later trial. *See Roberts,* 915 F.2d at 891 ("While a relevant consideration is whether 'an ordinary reasonable recipient who is familiar with the context of the letter would interpret it as a threat of injury,' [*United States v.] Maisonet,* 484 F.2d [1356, 1358 (4th Cir.1973), *cert. denied,* 415 U.S. 933, 94 S.Ct. 1447, 39 L.Ed.2d 491 (1974) ], there is no requirement that the actual recipient testify.")

*Watts, supra,* 394 U.S. at 706, 89 S.Ct. 1399, is instructive with respect to the sufficiency of the evidence in a prosecution such as the one at bar. There, the Supreme Court reversed Watts's conviction for threatening the President of the United States. The incident occurred while Watts was at a rally in Washington, D.C., protesting the Vietnam War and the draft. *Id.* at 706–07, 89 S.Ct. 1399. At the rally, Watts said, *id.* at 706, 89 S.Ct. 1399:

"They always holler at us to get an education. And now I have already received my draft classification as 1–A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J. [i.e., President Lyndon B. Johnson]."

The Supreme Court observed, *id.* at 707, 89 S.Ct. 1399: "[A] statute such as this one, [i.e., 18 U.S.C. § 871], which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. What is

a threat must be distinguished from what is constitutionally protected speech." Quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Court elaborated, *Watts,* 394 U.S. at 708, 89 S.Ct. 1399:

> [W]e must interpret the language Congress chose "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."

The Supreme Court concluded that the words in issue were a "kind of very crude offensive method of stating a political opposition to the President." *Id.* at 708, 89 S.Ct. 1399. However, when viewed "in context," and considered with "the expressly conditional nature of the statement and the reaction of the listeners," who reportedly laughed, the Supreme Court determined that the words did not constitute a "threat" to the President within the scope of the statute. *Id.* It reasoned: "We do not believe that the kind of political hyperbole indulged in by petitioner fits within that statutory term." *Id.*

*Pendergast, supra,* 99 Md.App. 141, 636 A.2d 18, is the leading case in Maryland with respect to Article 27, § 561A, the predecessor to C.L. § 3–708(b). The alleged threats at issue there were contained in letters written by a State inmate to two State judges, each of whom had sentenced the defendant to imprisonment with respect to separate convictions. Both judges testified at trial that they regarded the defendant's letters as threats. *Id.* at 144, 636 A.2d 18. In one letter, the defendant wrote, in part, *id.* at 143, 636 A.2d 18:

> "If I don't receive Justice, I won't come out of this place in my right mind and I will also not be responsible for my actions, I hope & pray this is one chance we don't take.
> Thank you
> Steve Pendergast
> P.S. Answer fast or"

The second letter, sent eight months later, stated, in part:

"If you don't think I will seek *'Revenge'* to the highest degree. All you have to do is keep this *Injustice* on ME.

I will NEVER change my mind unless I get justice, we'll see who hurts in the *END[.]* "

*Id.* at 143–44, 636 A.2d 18 (emphasis in original).

Following the defendant's conviction, he appealed to this Court, challenging the sufficiency of the evidence. The Court admonished:

[W]e conclude that because section 561 A criminalizes pure speech and thereby implicates the free speech protections of the First Amendment and of Article 40 of the Maryland Declaration of Rights, Maryland courts, in ruling on a motion for judgment of acquittal, must narrowly construe the statute and determine whether the speech is a true threat.

*Id.* at 148, 636 A.2d 18. Nevertheless, the Court concluded that "the evidence was sufficient to establish that the language in appellant's ... letter was a true threat to inflict bodily harm" within the meaning of § 561A. *Id.* at 149, 636 A.2d 18.

In reaching its decision, the Court cited, *inter alia, United States v. Maisonet,* 484 F.2d 1356 (4th Cir.1973), *cert. denied,* 415 U.S. 933, 94 S.Ct. 1447, 39 L.Ed.2d 491 (1974). *See* 99 Md.App. at 147, 636 A.2d 18. We pause to review *Maisonet.*

Raul Maisonet sent a letter to the judge who had convicted him of possession of a weapon by a convicted felon. In the letter, sent to the judge's home, Maisonet wrote that if he ever got out of prison "and nothing happen to me while I am in here, you will never be able to be prejudice and racist against another Puerto Rican like me." 484 F.2d at 1357. Maisonet was subsequently charged under 18 U.S.C. § 876, which criminalizes "mailing a letter 'containing ... any threat to injure the person of the addressee.' " *Id.* at 1357. At trial, Maisonet testified that he merely "intended to seek the judge's removal from office." *Id.* Although Maisonet had "complained to congressmen and civic organizations about the judge," he "was unable to show in these communications any specific request

for an investigation of the judge or for his removal." *Id.* His conviction followed.

On appeal, Maisonet contended that the court erred by failing to grant a judgment of acquittal, "because the government failed to introduce extrinsic evidence to show that he intended a threat to injure the judge." *Id.* The Fourth Circuit recognized that the issue of whether the letter constituted a threat "must be determined in the light of the context in which it was written." *Id.* at 1358. But, it was not persuaded by Maisonet's position. *Id.* The Fourth Circuit determined that "the context in which Maisonet privately wrote the judge does not compel the conclusion that his letter must be interpreted only as a crude, extravagant boast that he would have the judge removed." *Id.* at 1359. It reasoned, *id.* at 1358:

> If there is substantial evidence that tends to show beyond a reasonable doubt that an ordinary, reasonable recipient who is familiar with the context of the letter would interpret it as a threat of injury, the court should submit the case to the jury. Maisonet's letter itself and the following facts establish that the government's proof was sufficient to enable the jury to find beyond a reasonable doubt that the letter constituted a threat and Maisonet intended it as such: Maisonet had been sentenced to prison by the judge to whom he addressed the letter; he considered the sentence to be illegal; he charged that the judge was motivated by prejudice and racism; he addressed the letter to the judge's home; and he said nothing in the letter about having the judge investigated or about seeking his removal.

> Nor did Maisonet's defense that he was exercising first amendment rights require a judgment of acquittal at the conclusion of all the evidence.... Although he proved that he wrote congressmen and civic organizations, he was unable to show that he demanded either an investigation or the removal of the judge.

The *Pendergast* Court also cited *United States v. Barcley,* 452 F.2d 930 (8th Cir.1971), another case involving a conviction

under 18 U.S.C. § 876. *See* 99 Md.App. at 146–47, 636 A.2d 18. In *Barcley,* the conviction was predicated on a letter Barcley wrote to his attorney stating, in part: "[A]s soon as I can get this case situated around in the position I want you are the first S.O.B. that will go, [the prosecutor] will [be] next." 452 F.2d at 932. Reversing the conviction, the Eighth Circuit noted that there are "a number of innocuous interpretations which are equally plausible." *Id.* at 933. It stated: "Where a communication contains language which is equally susceptible of two interpretations, one threatening, and the other nonthreatening, the government carries the burden of presenting evidence serving to remove that ambiguity. Absent such proof, the trial court must direct a verdict of acquittal." *Id.* (citations omitted). In the court's view, the letter was "the kind of letter a court appointed attorney might expect to receive from a dissatisfied client...." *Id.* at 933–34. The Eighth Circuit reasoned, *id.* at 934:

> Barcley's letter, much like the communication in *Watts,* is worded in the rowdy dowdy argot of the streets, but it does not clearly convey a threat of injury. Considering the context in which it was written, the principles enunciated in *Watts* strongly suggest that the government must offer something more than the equivocal language present here to establish the communication of a threat. In this case, neither Barcley's attorney nor [the prosecutor] testified that he experienced fear upon reading the letter.[11]

*Roberts, supra,* 915 F.2d 889, is also informative. There, the defendant mailed a letter to Supreme Court Justice San-

---

11. The dissenting opinion in *Barcley* stated: "[I]t would seem of marginal significance whether the addressee and the prosecuting attorney were or were not in fact put in fear." *Id.* at 934 (Aldrich, J., dissenting). Reflecting on this disagreement, we explained in *Pendergast,* 99 Md.App. at 147, 636 A.2d 18: "Although the court in *Maisonet* indicated its agreement with the dissenting opinion in *Barcley,* there has been no appreciable inconsistency in the approach taken by the two courts." We pointed out that "the U.S. Court of Appeals for the Eighth Circuit has cited both cases with approval." *Id.* at 147-48, 636 A.2d 18 (citing *Martin, supra,* 691 F.2d at 1240) (holding that evidence was sufficient to withstand a motion for acquittal, where the threatening language was not ambiguous).

dra Day O'Connor, which said: "To O'Connor: Since the court insists upon violating my kids' rights to life (survive), you are all now notified that either Brennan,[ ] Stevens [ ] or Kennedy [ ] is to die." *Id.* at 890. When the defendant was interviewed, he indicated that he wrote the letter because of his view on abortion. *Id.* The defendant "stated that he had 'a love in his heart' for all the Justices of the Supreme Court, [and] he found no conflict between that love and his desire to kill." *Id.* Nevertheless, the Fourth Circuit found the evidence sufficient to support the defendant's conviction under 18 U.S.C. § 115(a)(1)(B) ("Whoever—threatens to assault, kidnap, or murder . . . a United States judge . . . with intent to impede, intimidate, or interfere with such official, . . . while engaged in the performance of official duties, or with intent to retaliate against such [judge] shall be punished . . .") *Id.* at 890–91.

More recently, in *United States v. Fullmer*, 584 F.3d 132, 153–58 (3d Cir.2009), the Third Circuit upheld the convictions of an animal cruelty activist under 18 U.S.C. § 43(a) (Animal Enterprise Protection Act). In that case, the defendant coordinated protests against targeted companies and individuals. *Id.* at 148. At one demonstration, held in front of a targeted individual's home, the defendant threatened to burn down the house, claiming that the police could not protect the homeowner. *Id.* at 157. In defense, the defendant claimed that her actions were protected by the First Amendment. *Id.* at 137, 153–56, 157.

The court noted that the targeted individual "lived in fear" that he would be physically assaulted. *Id.* at 157. According to the court, "his fear of the protestors acting on their threats was reasonable," and the defendant "could reasonably foresee that [he] would interpret her words as a serious expression of intent to harm [him] and his family." *Id.* Concluding that the defendant's action constituted a true threat, the court cited *Watts* and reasoned, *id.* (emphasis in original):

Under the *Watts* framework, this act, viewed in context with [her] other conduct, constitutes a true threat and is sufficient to remove her protest activity from First Amendment protection.[ ] We find it hard to see how threatening to

burn down someone's house is "political hyperbole" such that it might be protected by the First Amendment in the first place. However, even assuming that it has some underlying political value, viewed in the totality of the circumstances, this constituted a "true threat."

*Kosma, supra,* 951 F.2d at 553, is also noteworthy. There, the defendant was convicted under 18 U.S.C. § 871 of threatening President Reagan in a series of letters and mailgrams sent over a three-year period. *Id.* at 550–52. Kosma's first letter to President Reagan, postmarked March 2, 1988, invited the President to Philadelphia, stating, in part, *id.* at 550:

> We are going to give you a 21 Gun–Salute. 21 guns are going to put bullets thru your heart & brains. You are a Disgrace to the Air–Force. You are a Disgrace to Teddy Roosevelt. You are a disgrace to John F. Kennedy.... You are In Contempt of EVERYTHING that I represent, and standby, and believe.

Another letter addressed to President Reagan, but sent to a presidential assistant, stated, *id.* at 551: "[Y]ou are officially sentenced to death, by potassium-cyanide gas pellets. The impeachment is too lienient [sic] for you." Other communications sent to the presidential assistant referred to President Reagan's "Official Death Sentence," with dates and locations. *Id.*

On appeal, Kosma argued that "his letters to the President, though crude, offensive and inane, do not constitute 'true threats,' because they represent protected political speech under the First Amendment." *Id.* at 553. The Third Circuit observed, *id.*:

> [The defendant] contends that the letters were merely his unique way of commenting on President Reagan's fitness for office and his Administration's policies.[1] At the outset, we recognize that the First Amendment was meant to encompass not only learned political discourse but also vituperative verbal and written attacks on the President and other high government officials. *See Osborne v. Ohio,* 495 U.S. 103, [148, 110 S.Ct. 1691, 109 L.Ed.2d 98] (1990)

(Brennan, J., dissenting) ("When speech is eloquent and the ideas expressed lofty, it is easy to find restrictions on them invalid. But were the First Amendment limited to such discourse, our freedom would be sterile indeed."); *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ("debate on public issues should be uninhibited, robust and wide-open, and ... may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials").

In affirming the conviction, the court distinguished Kosma's statements from those at issue in *Watts,* noting that "there was no overtly political context for Kosma's letters." *Id.* at 554. In this regard, it observed that "Kosma mailed his letters unsolicited to the President," and the "content of his letters reveals an interest in political advocacy which is questionable at best." *Id.* Moreover, "Kosma's threats, though ostensibly phrased as 'invitations,' were not as conditional as those in *Watts,* which were dependent on the defendant's induction into the armed forces—a condition which the defendant stated would never happen." *Id.* In contrast, Kosma's threat included precise information, such as dates and locations, for his assassination.

*United States v. Callahan,* 702 F.2d 964 (11th Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983), also provides guidance. Callahan wrote a letter to the Director of the Secret Service that stated, in part, *id.* at 965:

"It is essential that Reagan and Bush are assassinated on Inauguration Day in front of the television cameras.

If you can arrange for me to get into the act, I will be willing to accept the responsibility.

I don't want anymore Protestant Scum in the White House. The separation of Church and State is a sacrosanct privilege to me and all Christians."

After Callahan was convicted under 18 U.S.C.A. § 871, he appealed, arguing that the statements in his letter did not constitute a "true threat." *Id.* The Eleventh Circuit disagreed, noting that the letter specified a time, date, and place

of the threatened assassination and, even though "the carrying out of the threat might have been conditional upon Secret Service aid and agreement, the threat itself was not." *Id.* at 966. In determining that Callahan's statements constituted a "true threat", the Eleventh Circuit stated, *id.* at 965: "The question is whether there was sufficient evidence to prove beyond a reasonable doubt that the defendant intentionally made the statement under such circumstances that a reasonable person would construe them as a serious expression of an intention to inflict bodily harm upon or to take the life of the persons named in the statute."

 The cases discussed above inescapably lead us to conclude that the evidence presented below, when construed in the light most favorable to the prosecution, was more than sufficient to find that appellant willfully and knowingly made a true threat to injure the Governor, in violation of C.L. § 3–708. We are satisfied that, in today's world, an e-mail constitutes a "threat in any written form," as required by C.L. § 3–708.[12] Moreover, appellant also admitted that he personally transmitted the e-mail to the Governor's office, "hoping" that the Governor would read it. Appellant's testimony established that he clearly intended to communicate to the Governor, allegedly for the purpose of getting the Governor's attention, because "you never get an answer any way from anybody."

To be sure, it was for the trier of fact to determine whether the content of the e-mail constituted a true threat to harm the Governor, rather than politically protected speech that merely voiced opposition to illegal immigration. In this regard, we are mindful that, before appellant sent the e-mail, he went to Annapolis to voice his opinion about illegal immigrants, and also posted a sign on his property about President Bush. But, a jury construing the e-mail could readily conclude that the oblique references in the e-mail to the Governor's "MEXICAN army" and "true AMERICAN'S" did not convert the e-mail to a political statement. Rather, a reasonable person receiving

---

12. Appellant does not contend otherwise.

the e-mail could have interpreted it as a serious expression of an intent to harm the Governor.

We also recognize that appellant's threat was conditioned on physical proximity to the Governor, in order for appellant to have the ability to "[w]rap [his] hands around [the Governor's] throat. . . ." Elected officials often make public appearances. Clearly, the contingency did not, as a matter of law, preclude a jury from finding that the communication amounted to a true threat. *Howell, supra,* 719 F.2d at 1260 (hospital patient's statement that, if released, he would kill the President was a true threat); *Callahan, supra,* 702 F.2d at 965 (letter to the Secret Service offering to kill the President if the Secret Service made proper arrangements at the President's inauguration constituted a true threat).

## II.

Appellant complains that the court erred by failing to propound certain jury instructions that he requested, both in writing and orally at trial, pertaining to his constitutional right to political expression and the requirement that the communication must be a true threat. Before reviewing the parties' legal contentions in more detail, we pause to review what transpired below.

Appellant proposed the following five written instructions, among others:

- UNITED STATES CONSTITUTION, AMENDMENT 1: Congress shall make no law abridging the freedom of speech, or, the right of the people to petition the Government for a redress of grievances. This law is made applicable to the State of Maryland, by virtue of the 14th Amendment of the United State Constitution.

- MARYLAND DECLARATION OF RIGHTS, ARTICLE 10: That freedom of speech and debate . . . ought not to be impeached in any Court of Judicature.

■ MARYLAND DECLARATION OF RIGHTS, ARTICLE 13: That every man hath a right to petition the Legislature for the redress of grievances in a peaceable and orderly manner.

■ MARYLAND DECLARATION OF RIGHTS, ARTICLE 23: In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as fact. . . . [13]

■ MARYLAND DECLARATION OF RIGHTS, ARTICLE 40: That every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege.

■ Appellant also requested a missing witness instruction with respect to the State's failure to call Governor O'Malley.[11]

---

**13.** In his proposed jury instructions, appellant only included this introductory portion of Article 23 of the Maryland Declaration of Rights. This requested instruction is not a correct statement of the law. The Court of Appeals has said: "Implicit in the decisions of this Court limiting the jury's judicial role to the 'law of the crime' is a recognition that all other legal issues are for the judge alone to decide." *Stevenson v. State*, 289 Md. 167, 179, 423 A.2d 558 (1980). In *State v. Adams*, 406 Md. 240, 256–58, 958 A.2d 295 (2008), the Court stated:

> By its terms, *Stevenson* purported to express the limitations on the power of the jury implicit in earlier Maryland appellate decisions. *See, e.g., Lewis v. State*, 285 Md. 705, 724, 404 A.2d 1073, 1083 (1979); *Vogel v. State*, 163 Md. 267, 272, 162 A. 705, 708 (1932); *Bell, alias Kimball v. State*, 57 Md. 108, 120 (1881); *Wheeler v. State*, 42 Md. 563, 570 (1875). "Rather, the *Stevenson* court is clear that it did not make new law, but rather it merely clarified what has always been the law in Maryland." *Jenkins v. Smith*, 38 F.Supp.2d 417, 421 (D.Md.1999), *aff'd, Jenkins v. Hutchinson*, 221 F.3d 679, 684 (4th Cir.2000).[ ] The *Stevenson* Court pointed out that "this Court has consistently interpreted this constitutional provision as restraining the jury's law deciding power to this limited, albeit important, area." *Stevenson*, 289 Md. at 178, 423 A.2d at 564. The majority opinion highlighted, as an example, a then recent decision applying the long established principle that the jury serves only as a judge of the "law of the crime." *See Lewis v. State*, 285 Md. [at] 724, 404 A.2d 1073. . . .

**14.** Appellant proposed the following jury instruction:

> You have heard testimony about Governor Martin O'Malley, being the victim of the alleged threatening e-mail. Governor O'Malley was not called as a witness in this case. If a witness could have given

The following colloquy regarding jury instructions is pertinent:

[THE COURT]: ... I'm just going to read the parts of the statute that are applicable.

[THE PROSECUTOR]: ... [G]iven the state of the evidence and counsel's opening statement, I would appreciate it and request that you also mention when you're discussing the statute, that the State does not have a burden of proving either that he intended to carry out the threat or had the ability to carry out the threat.

[THE COURT]: Okay. All right and [appellant's counsel], let me take a look at your [requested jury instructions]. Okay. Your missing witness instruction, you want to say anything about it? I understand it. I don't intend to give it unless you can give me some reason why that would be applicable in this case.

---

important testimony on an issue in this case, such as whether or not he felt threatened by Mr. Abbott's e-mail, and if the witness was peculiarly within the power of the State to produce, but was not called as a witness by the State and the absence of that witness was not sufficiently accounted for or explained then you may decide that the testimony of that witness would have been unfavorable to the State.

In his brief, appellant included in his questions presented the contention that the trial court failed to propound a missing witness instruction. But, he failed to discuss this issue elsewhere in his brief. In *Oak Crest Village, Inc. v. Murphy*, 379 Md. 229, 241, 841 A.2d 816 (2004), the Court said: "An appellant is required to articulate and adequately argue all issues the appellant desires the appellate court to consider in the appellant's initial brief." *DiPino v. Davis*, 354 Md. 18, 729 A.2d 354 (1999), is also instructive. There, the Court explained, *id.* at 56, 729 A.2d 354:

It is true that, if a point germane to the appeal is not adequately raised in a party's brief, the court may, and ordinarily should, decline to address it. *Health Serv. Cost Rev. v. Lutheran Hosp.*, 298 Md. 651, 664, 472 A.2d 55, 61 (1984). Apart from the fact that Maryland Rule 8-504(a)(5) requires the brief to contain argument, it would normally be unfair to the other party for the court to rule adversely to that party on an issue that was not properly presented and on which the party therefore had no adequate opportunity to respond.

Accordingly, we decline to address the matter of a missing witness instruction.

[APPELLANT'S COUNSEL]: Well, although it's not obviously mandatory or required of the State to call Governor O'Malley, they had the power to do so . . .

[THE COURT]: So did you. How did they have any more power than you had?

[APPELLANT'S COUNSEL]: Well, it's the State's burden to prove the case. I think whether or not Governor O'Malley saw the e-mail, received the e-mail or whether he felt threatened by it, is relevant as . . .

[THE COURT]: I don't.

[APPELLANT'S COUNSEL]: I know you don't but as stated, I'm asking for the instruction.

[THE COURT]: Okay.

[APPELLANT'S COUNSEL]: Based on your ruling on the Motion for judgment of acquittal, can't imagine you giving that instruction but I want to take exception to the Court not granting us that instruction.

Thereafter, the court instructed the jury, in relevant part: [T]here's only one charge that you're being asked to decide in this case and the one charge is the charge of threat against a State official. Now, let me tell you what that is legally. A person may not knowingly and willfully make a threat to take the life of or cause physical injury to a State official. The Governor of the State of Maryland is a State official. There is no requirement that the State prove that the Defendant intended to carry out the threat when it was made or even had the ability to carry out the conduct threatened. Nor is there any requirement that the State official felt threatened. The essence of this offense is the making of the threat.

The court did not define the element of "a threat" or otherwise provide guidance to the jury as to how it should determine whether the communication constituted a threat. In particular, the court did not specify that an individual may only be convicted of a violation of C.L. § 3–708(b) if the content of the communication constituted "a true threat." Nor did the court inform the jury that the statute does not

criminalize statements of political expression, and that it is the jury's responsibility to distinguish political hyperbole from a true threat.

After the court delivered its jury instructions, appellant's counsel asked the court to "make it clear [to the jurors] that they have to find it to be a real threat." The following colloquy is pertinent:

[THE COURT]: Real threat, okay. What else?

[APPELLANT'S COUNSEL]: I'm going to object to your instruction relating to whether or not the testimony of the State official is required. I think that's the wrong law. It's not required, nobody's saying it is but. . . .

[THE COURT]: No, I didn't say his testimony was required. I said nor is there any requirement that the State official felt threatened. That's what I said.

[APPELLANT'S COUNSEL]: Well, I make an objection to that.

\* \* \*

[APPELLANT'S COUNSEL]: I would also take exception to your Honor not giving the . . . missing witness instruction as requested. . . . I would also ask the Court to instruct the jury . . . that they, quote they are to narrowly construe the statute and determine whether the speech is a true threat as stated in *Pendergast,* [*supra,* 99 Md.App. 141, 636 A.2d 18,] and it is the law of the State. . . . And, finally, and, again, I'm quoting from *Pendergast v. State,* again, I would ask the Court to instruct the jury that the statute such as the one we have today that he, that Mr. Abbott's charged with, which makes . . . criminal a form of (inaudible) speech *must be interpreted within, with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech.*

[THE COURT]: Okay.

[APPELLANT'S COUNSEL]: I would ask the Judge, your Honor, to give that instruction.

[THE COURT]: Well, I don't intend to supplement any of the instructions by what you've asked for, quite frankly. If this were a civil case, this, this would be a case where a Judge would grant Motion for judgment, in my view. It's a criminal case so that can't happen but in this case, the statements made are, in my view, by definition, a threat. As a matter of law, they are. In my view, that statement made that is a threat violates the statute, as a matter of law. But, since this is a criminal case, the Court has no ability to grant a Motion to find as a matter of law that the crime is made out. Whether the threat is a real threat or not, I have no ability, nor does any other human being that I know of, have the ability to delve into a Defendant's mind to know whether the Defendant is, whether it's a quote unquote real as you say. It's, in my view, the violation of this statute is the making of a threat of bodily harm to a State official and whether the maker intended to carry out the threat or had the ability to carry out the threat or whether the State official felt threatened or didn't feel threatened, none of those factors affect the wrong that this statute is addressed to protect against . . . (Emphasis added.)

Appellant contends that the trial court erred by refusing to propound his proposed jury instructions (instructions nine through thirteen), which "merely stated what the law is regarding the First Amendment [to the United States Constitution] and the Maryland Declaration of Rights." In his view, the court "denied [him] the right and ability to frame his email to Gov. O'Malley—in response to Gov. O'Malley's solicitation of opinions—as 'political hyperbole.'" Further, he disputes the court's "rationale" for its ruling, i.e., "that the statute was found to be constitutional, so there is no right to raise the constitutional issue." Noting that the trial court instructed the jury that the State did not have to show that the "State official felt threatened," appellant argues:

Coupled with the other court's instructions, i.e., the State did not have to "prove that [appellant] intended to carry out the threat, *refusal to give an instruction that it at least had to be a "real threat",* . . . rendered it impossible for the

Defendant to receive a fair trial. (Citations omitted) (emphasis added).

The State counters that the trial court properly denied appellant's instructions nine through thirteen because they "were simply not proper jury instructions." In the State's view, these proposed instructions were "incomplete quotations from various constitutional provisions and not a correct statement of the law that is applicable to this case." Further, it posits:

Merely reading them to the jury without more would have given the jury no guidance as to how to apply the provisions to the evidence at issue in deciding whether there had been a violation of the statute. If anything, reading them to the jury would very likely have led to jury confusion and possibly misapplication of the law to the facts.

Moreover, the State argues that appellant waived his claim that the court improperly refused to "instruct the jury that the threat must be a 'real threat' and that the jury must narrowly construe the statute and distinguish a threat from constitutionally protected speech ...," because he did not include these requests in the proposed written instructions he submitted before trial. While recognizing that appellant "took exception to the court not giving these instructions," the State insists that the "exception was not sufficient." Citing *Bowman v. State*, 337 Md. 65, 69, 650 A.2d 954 (1994), the State explains that appellant failed to offer "specific additional instructions to the court for consideration that would explain how the jury should determine whether the e-mail communication constituted a 'real threat' or 'true threat,' as opposed to 'constitutionally protected speech.'" The State elaborates:

A jury, left without specific instruction as to what was meant by a "real threat," could easily conclude that a "real threat" to strangle the Governor must be one in which the maker intended to strangle the Governor, which is clearly contrary to applicable law. Because Abbott did not clearly articulate the instruction that he wanted the court to give, he waived this claim. (Citations omitted).

Preliminarily, we find no merit in the State's waiver claim. From the inception of the trial, continuing through the jury instructions, defense counsel underscored that the linch-pin of appellant's defense was that the e-mail constituted political hyperbole, and was therefore outside the ambit of C.L. § 3–708(b). At the outset of trial, for example, the State moved in limine to bar appellant from arguing in opening statement that the e-mail was protected by the First Amendment. The following colloquy ensued:

[APPELLANT'S COUNSEL]: ... Your Honor, we're not and don't intend to argue the constitutionality of the statute. The statute on its face is constitutional, however ... *one's rights to freedom of speech and political expression [are] a defense in a case like this when his threat was preceded by statements about his views on the illegal immigration and things of that nature.* So by preceding his alleged threat with those comments that are political in nature ... a statute such as this one which makes a criminal form of speech must be interpreted within the commands of the First Amendment clearly in mind. *What is a threat, must be distinguished from what is constitutionally protected speech.... [A]ny statement ... made or potentially made to be an alleged threat has to be considered in the context of what is said and in this case he preceded his comments with the illegal immigration issue so it's a real defense for the jury to consider, not arguing constitutionality of the statute.*

[THE COURT]: Okay. [Counsel for the State?]

[THE PROSECUTOR]: ... There's no question that the Defendant has a right to communicate with a public official. When that communication steps, steps outside of a certain boundary and becomes a threat, it is no longer constitution-ally protected. The case law is clear as to that. *So the question in this case is only is the language in the commu-nication a threat? That's the sole issue for the jury to decide with regard to this. If it is, ... they don't have to answer any question about constitutionality, that's been answered for us. If they decide it's not a threat, then it's*

*not guilty under the very words of the statute.* So to allow the defense to make a First Amendment argument would put the State in the position of having to engage the jury in a discussion of First Amendment jurisprudence which I think all the cases recognize isn't appropriate.

[THE COURT]: Okay. *Well, I agree with [the State]. I think the jury decides in this case whether the communication ... was a threat or not.... They don't decide whether it's, whether he has a constitutional right to make a threat, because he doesn't.* The statute is clear in Maryland, that you don't have a right to make a threat to a public official. Now, you can't argue that the Constitution overrides that statute and *the issue in this case is simply did Mr. Abbott make a threat to, in this case, Governor O'Malley.* The jury will decide he either did or he didn't. If he did, then that makes out the crime.... *I'm not going to allow an argument to be made ... to the jury, that it is ... constitutionally protected to make such a threat,* because quite frankly, contrary to what we talked about in chambers, I don't think the *Watts* case says that at all. I don't think it says that if you make a threat but you do it in the context of a political statement, ... that takes away from it being a threat.... The facts [of this case] are not similar [to the facts of *Watts* ] as I understand them to be[,] so the Motion in liminae [sic] filed by the State is granted. You cannot argue to the jury without first coming up and getting permission from the Court the constitutionality of the right.... *[Y]ou can't argue that the First Amendment allows it.* The jury doesn't decide, we don't get into a constitutional debate with the jury or have them debate what is the Constitution. They follow the law as I state it to them.

[APPELLANT'S COUNSEL]: But I really don't understand the extent of the Motion in liminae [sic]. Are you telling me as counsel that I cannot argue that he has a right of freedom of expression?

[THE COURT]: No, you can't tell them that he has, that there is something that the Constitution overrides this statute.

[APPELLANT'S COUNSEL]: ... My question is, *are you advising or ordering me not to say that Mr. Abbott has the right of political expression?*

[THE COURT]: *Everybody has the right of political expression.*

[APPELLANT'S COUNSEL]: That's what I thought.

[THE COURT]: *But he doesn't have the right to threaten the State official.*

[APPELLANT'S COUNSEL]: But, what I'm saying is, are you telling me that I can't argue this particular alleged ...

[THE COURT]: *You can argue that this wasn't a threat of a public official. You can argue that Mr. Abbott didn't threaten a public official. You can argue that these words do not constitute a threat.*

[APPELLANT'S COUNSEL]: I mean, my question is that the words that he said are taken in light of another statement preceding that which is his right to political expression.

[THE COURT]: No, it isn't. You don't have a right to say and I don't think *Watts* says you have a right to say politically I really disagree with everything that the Governor says about any issue. As a matter of fact, I find it disgusting.... I find it outrageous, his position in regard to whatever and because of that I'm going to choke the life out of him if I get a chance. I'm saying it doesn't make any difference that you say because I disagree with his politics or I disagree with his political, with his position on any particular political issue. The law doesn't permit that.

[APPELLANT'S COUNSEL]: ... [F]or the record[, I] would just note an exception because *I think what the Court's doing is preventing me from arguing a factual defense and that is his rights to free and unfettered political expression.*

[THE COURT]: He doesn't have a right to free and unfettered political expression if that, if that political expression includes the right to threat[en] to do somebody bodily harm.

[APPELLANT'S COUNSEL]: But you're saying that's not a jury question.

[THE COURT]: *It's not a jury question.*

[APPELLANT'S COUNSEL]: Okay. I'll just note my exception.

(Emphasis added).

The State conceded early on that the "sole issue" for the jury to decide was whether the communication constituted a threat. In other colloquies during trial, the defense reiterated its position that the disputed communication was not a "real" threat. On this record, it is evident that the court did not decline to propound the requested instruction as to a true threat because the language of appellant's proposed instruction was deficient. To the contrary, it declined to so instruct because it saw no merit in appellant's position.

We find no support for the suggestion that the court need not give an instruction merely because it is poorly or inadequately worded. The responsibility of a judge to instruct the jury in a criminal trial is governed by Maryland Rule 4–325(c), which provides:

> The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

*See also Roach v. State,* 358 Md. 418, 427, 749 A.2d 787 (2000).

In *Clark v. State,* 80 Md.App. 405, 414, 564 A.2d 90 (1989), the defendant's requested jury instructions were not technically correct statements of the law. Nevertheless, this Court held that appellant was entitled to a correct jury instruction.

*Id.* at 414–15, 564 A.2d 90. Judge Bell explained, *id.* at 412, 564 A.2d 90:

> We hold that the court must instruct the jury on a matter which is a proper subject for instructions where a timely request has been made even though that request is not totally accurate and may contain some erroneous material. To hold otherwise would be to place on the parties the responsibility for determining what the law is, a responsibility which is properly entrusted to the court. *See Gooch v. State,* 34 Md.App. 331, 367 A.2d 90 (1976), *cert. denied,* 280 Md. 735 (1977); *Braxton v. State,* 11 Md.App. 435, 274 A.2d 647, *cert. denied,* 262 Md. 745 (1971).

In reaching its conclusion, the *Clark* Court found it "significant" that Md. Rule 4–325(c) "requires the court to 'instruct the jury as to the applicable law' when requested to do so by a party; it does not specify that the court must instruct the jury as to the applicable law only upon request of a party by means of a proposed instruction which correctly states the law." *Id.* at 414, 564 A.2d 90. The Court reasoned, *id.* (emphasis in original):

> Moreover, to interpret [Md. Rule 4–325(c) ] as requiring a party desiring an instruction to submit a suggested one which contains a correct statement of the law could lead to anomalous and absurd results. Consider the following scenario. The evidence in a case would support the giving of an instruction on a subject of some importance in the case and which both parties agree should be given. Unfortunately, neither of the proposed instructions submitted by the parties is a technically correct statement of the law on the subject. Under the State's argument, notwithstanding the importance of the issue, hence, the desirability of instructing the jury on it, and the fact that both parties requested an instruction on the point, the court would not have to give *any* instruction. Such a result is untenable.

In *Privette v. State,* 320 Md. 738, 747, 580 A.2d 188 (1990), the Court recognized that the trial judge "cannot be faulted for failing to give the precise instruction requested by the

defendants" because "[i]t is a mish-mash of garbled verbiage, more apt to confuse than to inform." Nevertheless, it determined that the appellant's failure to submit a more fully developed jury instruction did not relieve the trial court of its responsibility to craft an appropriate instruction as to the applicable law. Accordingly, the Court of Appeals concluded that the failure to instruct the jury as to the applicable law required a new trial.[15]

Generally, on review, we " 'must determine whether the requested instruction was a correct statement of the law; whether it was applicable under the facts of the case [*i.e.*, whether the evidence was sufficient to generate the desired instruction]; and whether it was fairly covered in the instructions actually given.' " *Janey v. State*, 166 Md.App. 645, 654, 891 A.2d 355 (emphasis and brackets in original) (quoting *Gunning v. State*, 347 Md. 332, 348, 701 A.2d 374 (1997)), *cert. denied*, 392 Md. 725, 898 A.2d 1005 (2006). *See also McMillan v. State*, 181 Md.App. 298, 329, 956 A.2d 716, *cert. granted*, 406 Md. 744, 962 A.2d 370 (2008). In *Smith v. State*, 403 Md. 659, 944 A.2d 505 (2008) (citations omitted), the Court of Appeals explained, *id.* at 663–64, 944 A.2d 505 (citations omitted):

> "We have held that the standard of review for jury instructions is that so long as the law is fairly covered by the jury instructions, reviewing courts should not disturb them." ... If, however, the instructions are "ambiguous, misleading or confusing" to jurors, those instructions will result in reversal and a remand for a new trial.... On the other hand, the instructions must be read in context. "The charge to the jury must be considered as a whole and the Court will not condemn a charge because of the way in which it is expressed or because an isolated part of it does not seem to do justice to one side or the other."

---

15. We recognize that appellant's proposed text was not helpful to the judge. But, the State also failed to provide the court with any guidance as to the elements of the offense.

*Fleming v. State,* 373 Md. 426, 433, 818 A.2d 1117 (2003), is also pertinent. There, the Court explained: "The jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and cover adequately the issues raised by the evidence, the defendant has not been prejudiced and reversal is inappropriate." *See also Roary v. State,* 385 Md. 217, 237, 867 A.2d 1095 (2005).

With these principles in mind, we are satisfied that the court did not err or abuse its discretion in failing to propound appellant's proposed instructions nine through thirteen. They were either incomplete quotations of constitutional provisions that had no application to this case; deficient because they did not include any guidance to the jury as to how to apply the provisions in the context of the evidence; or they were legally incorrect. Moreover, to the extent that the provisions had any bearing on the case, the court, in its discretion, was not required to inform the jury of the source of appellant's rights. *Cf. Thompson v. State,* 393 Md. 291, 311, 901 A.2d 208 (2006) (explaining that we review for abuse of discretion a trial judge's decision whether to give a particular jury instruction). The question remains, however, whether appellant was entitled to the requested jury instruction concerning a "true threat."

"The main purpose of a jury instruction is to aid the jury in clearly understanding the case, to provide guidance for the jury's deliberations, and to help the jury arrive at a correct verdict." *Chambers v. State,* 337 Md. 44, 48, 650 A.2d 727 (1994). Whether the requested instruction is applicable to the particular facts is a question of law. *Roach,* 358 Md. at 428, 749 A.2d 787. This "turns on whether there is any evidence in the case that supports the instruction." *Dishman v. State,* 352 Md. 279, 292, 721 A.2d 699 (1998); *see Riggins v. State,* 155 Md.App. 181, 222, 843 A.2d 115, *cert. denied,* 381 Md. 676, 851 A.2d 595 (2004).

Ordinarily, " 'a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor.' "

*General v. State,* 367 Md. 475, 486, 789 A.2d 102 (2002) (quoting *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988)); *see Binnie, supra,* 321 Md. at 582, 583 A.2d 1037 (" '[A] defendant is entitled to have the jury instructed on any theory of defense that is fairly supported by the evidence, even if several theories offered are inconsistent.' ") (quoting *Sims v. State,* 319 Md. 540, 550, 573 A.2d 1317 (1990)). The threshold is not high, however. A criminal defendant is entitled to an accurate jury instruction so long as the defendant " 'produced that minimum threshold of evidence necessary to establish a *prima facie* case that would allow a jury to rationally conclude that the evidence supports the application of the legal theory desired.' " *Cantine v. State,* 160 Md.App. 391, 410–11, 864 A.2d 226 (2004) (citation omitted), *cert. denied,* 386 Md. 181, 872 A.2d 46 (2005). Moreover, to ascertain whether "competent evidence exists to generate the requested instruction, we view the evidence in the light most favorable to the accused." *Fleming,* 373 Md. at 433, 818 A.2d 1117; *accord Brogden v. State,* 384 Md. 631, 650, 866 A.2d 129 (2005). Put another way, a requested instruction must be given if there is "some evidence" that supports the defense theory. Notably, the State did not argue that appellant failed to meet the minimum threshold to pursue his defense.

■ As we have indicated, C.L. § 3–708, like its federal counterpart, 18 U.S.C. § 871, "makes criminal a form of pure speech," and therefore it "must be interpreted with the commands of the First Amendment clearly in mind." *Watts, supra,* 394 U.S. at 707, 89 S.Ct. 1399 (referring to 18 U.S.C. § 871). In effect, this requires a factfinder to distinguish a true threat "from what is constitutionally protected speech." *Id.; see Roberts, supra,* 915 F.2d at 890–91; *Maisonet, supra,* 484 F.2d at 1359.

■ Here, the court informed the jury of the applicable statutory provision; the court read the text of C.L. § 3–708(b), regarding the making of a threat. But, the court's instruction was incomplete. The court never instructed the

jury as to the meaning of "a threat." Nor did it provide any guidance to the jury as to how to determine whether the communication amounted to a threat, or instruct that only a "true threat" violates the statute. Therefore, its instruction was erroneous. We explain.

A review of the pattern federal jury instructions with respect to 18 U.S.C. § 871 (threats against the President) highlights the deficiencies in the circuit court's instruction. We quote, in part, from MFJI § 31–4 as to the "Second Element—Threat." [16] It states, in part:

> The second element the government must establish beyond a reasonable doubt is that the words communicated by the defendant were in fact a threat, as I will define that term for you.

> A threat is a serious statement expressing an intention to inflict bodily injury (*or* kill *or* kidnap) at once or in the future, as distinguished from idle or careless talk, exaggeration, or something said in a joking manner. A statement is a threat if it was made under such circumstances that a reasonable person hearing or reading the statement would understand it as a serious expression of intent to inflict bodily injury (*or* a reasonable person making the statement would foresee that the recipient would understand it as a serious expression of intent to inflict bodily injury).

> To determine whether or not the defendant "threatened" the President, you should consider the circumstances under which the statement was made, including its context with respect to surrounding conversation, the language the defendant used, and the reaction of those who heard or read the statement. You may also consider the defendant's political loyalties, but I remind you that the even the crudest, most offensive methods of stating political opposition to the President are not threats as I have defined that term for you. . . .

---

16. MFJI § 31–2 sets forth all the elements of the offense. It states, in part: "Second [element], that the words were in fact a threat;"

*Dysart, supra,* 705 F.2d 1247, is also instructive in analyzing the adequacy of the circuit court's instruction. On April 9, 1981, Dysart mailed a letter to President Reagan that stated, in part: "I am going to fly to Washington and am going to assassinate you on May 5, 1981." *Id.* at 1249. Four days later, Dysart mailed another letter to President Reagan, apologizing for his previous letter. *Id.* He claimed in the second letter that he "would never want to do anything that would cause harm or slight to befall you." *Id.* The letters were opened by a United State Postal Service employee. *Id.* at 1248, 1248 n. 1.

On appeal, Dysart argued that "the trial court erred in failing to charge that for conviction under § 871, it must be shown that Dysart intended the letter to be taken as a threat, even if he had no intention of carrying out the threat." *Id.* at 1256. The Tenth Circuit disagreed, noting: "A conviction under § 871 does not require proof that the defendant actually intended to carry out the threat." *Id.*

Of particular significance here, Dysart also complained that the jury instructions did not make clear that he could not be convicted unless the communication constituted a true threat. The court quoted with approval the trial court's jury instructions, which stand in marked contrast to the instructions delivered in this case. *Id.* at 1256. They provided, *id.:*

> In a prosecution for threats against the President, it is not necessary to show that the defendant intended to carry out the threat, nor is it necessary to prove that the defendant actually had the apparent ability to carry out the threat.
>
> The question is whether those who hear or read the threat reasonably consider that an actual threat has been made. It is the making of the threat, not the intention to carry it out, that violates the law.

\* \* \* \* \* \*

> *The term "threat" means an avowed present determination or intent to injure presently or in the future. A*

*statement may constitute a threat even though it is subject to a possible contingency in the maker's control. The prosecution must establish a "true threat" which means a serious threat as distinguished from words as mere political argument, talk or jest.*

*In determining whether words were uttered as a threat, the context in which they were spoken must be considered.* (Emphasis added.)

The Tenth Circuit was "persuaded that the 'true threat' requirement of *Watts, supra,* was satisfied by the instruction." *Id.* It also said: "Dysart's complaint that the instructions did not avoid the risk of conviction for a crude jest or expression of political hostility is clearly untenable in light of the explicit guidance on that point found in the instructions." *Id. See also United States v. Smith,* 670 F.2d 921, 923 n. 2 (10th Cir.1982) (involving a conviction under 18 U.S.C. § 871 for mailing a threatening letter to President Carter; the trial court gave the following jury instruction, in part: "The prosecution must establish a 'true threat,' which means a serious threat as distinguished from words uttered as mere political argument, idle talk or jest. In determining whether words were uttered as a threat the context in which they were spoken must be considered.")

In *Maisonet,* the Fourth Circuit made the following observations about the jury instructions, 484 F.2d at 1359:

[The district judge] charged the jury that the government was required to prove beyond a reasonable doubt that the letter contained a threat to injure the judge and that Maisonet intended it to be such a threat. He instructed that every person has the right to communicate with any public official calling attention to improper or unlawful conduct on the official's part and that the language used may be "vehement, caustic, unpleasantly sharp, vituperative, abusive, or inexact" without violating the law. He cautioned that every person has the right to seek by proper means the removal of any public official, and finally, he told the jury that a threat to seek an official's removal, regardless of

whether the person has reasonable grounds to believe that the official acted improperly, is not a violation of the law.

The court's instructions in this case did not resemble those in *Dysart, Smith,* or *Maisonet.* Appellant took exception to the jury instructions, claiming that the court did not "make it clear that [the jurors] have to find it to be a real threat." Although the court explained to the jury that appellant had to "knowingly and willfully make a threat to take the life of or cause physical injury to a State official," and that "[t]he essence of this offense is the making of the threat," the court never informed the jury that only a true threat falls within the statute, and that political vitriol may fall outside its ambit.

We conclude that the court erred because it did not define the term "threat" or instruct the jury about how it was to determine whether the e-mail communication constituted a threat. In this regard, the court should have instructed the jury as to the requirement of a true threat, which is distinguished from constitutionally protected speech. Accordingly, we shall vacate appellant's conviction and remand for a new trial.[17]

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY BALTIMORE COUNTY.**

---

**17.** On remand, the court should look for guidance to the instructions contained in MFJI.

In light of our disposition, we need not address appellant's claim that the court improperly restricted the opening and closing arguments of defense counsel. Nevertheless, defense counsel did, in fact, argue to the jury that appellant's e-mail was merely "a political statement," and that he had "a right" to express his views. In the context of this case, however, the argument of counsel was not an adequate substitute for a full explanation by the court of the elements of the offense. The court's failure to fully instruct the jury deprived appellant of the judicial imprimatur of his defense—that, if the jury concluded that the e-mail was, in fact, a political statement, then it was not a true threat. This is not to suggest that the jury necessarily would have agreed with appellant's defense. But, that is not the test.